Mary **REESE, Velma Bailey, Herbert Jones, Patricia Sanders, and L.I.F.F.T., an unincorporated association, Plaintiffs,**

v.

**MIAMI–DADE COUNTY, Rene Rodriguez, Director of the Miami–Dade Housing Agency, Mel R. Martinez, Secretary of United States Department of Housing and Urban Development, United States Department of Housing and Urban Development, Defendants.**

**No. 01–CV–3766–CIV.**

United States District Court, S.D. Florida.

July 2, 2002.

Charles F. Elsesser, Jr., Florida Legal Services Inc., Benjamine Reid, Carlton Fields, Miami, FL, Todd Isaac Espinosa, Nationalo Housing Law Project, Oakland, CA, for plaintiffs.

John Darrell McInnis, Terrance Andrew Smith, David Stephen Hope, Cynji Lee, Dade County Attorney's Office, Laura W. Bonn, United States Attorney's Office, Miami, FL, for defendants.

## *ORDER*

HIGHSMITH, District Judge.

THIS CAUSE is before the Court upon the remainder of the County Defendants' motion to dismiss (DE 38).[1] In the remainder of their motion, the County Defendants seek to dismiss counts X, XI, XII, and XIV of Plaintiffs' complaint, pursuant to Fed.R.Civ.P. 12(b)(6). Alternatively, the County Defendants move for a more definite statement pursuant to Fed. R.Civ.P. 12(e). For the reasons that fol-

---

1. In an order dated May 24, 2002, the Court ruled on that portion of the County Defendants' motion to dismiss that raised various jurisdictional issues. In its ruling, the Court did not address the remainder of the County Defendants' motion, which is the subject of this order.

low, the County Defendants' motion should be granted in part and denied in part.

## II. Introduction

This case involves the use of federal funds to revitalize the public housing communities known as James E. Scott Homes and Carver Homes, both located in Miami–Dade County. Defendants are Miami–Dade County and Rene Rodriguez (the "County Defendants"), and the United States Department of Housing and Urban Development ("HUD") and its Secretary, Mel R. Martinez (the "Federal Defendants"). Plaintiffs are Mary Reese and Velma Bailey (sometimes referred to as the "current tenants").[2]

Plaintiffs commenced this purported class-action lawsuit claiming, among other things, that the County Defendants have violated: the Quality Housing and Work Responsibility Act of 1998 (count X); the Housing and Community Development Act (counts XI and XII); and the Uniform Relocation Assistance and Real Property Acquisition Act of 1970 (count XIV). In response, the County Defendants filed the instant motion.[3]

## I. Standard of Review

"[A] complaint should not be dismissed for failure to state a claim unless it ap-pears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957). When considering a motion to dismiss pursuant to Rule 12(b)(6), the complaint is construed in the light most favorable to the plaintiff, and all facts alleged by the plaintiff are accepted as true. *See, SEC v. ESM Group, Inc.*, 835 F.2d 270, 272 (11th Cir.1988). Moreover, the liberal-pleading requirements of Rule 8 necessitates only that the complaint set forth a generalized statement of facts from which a defendant will be able to frame a responsive pleading. Thus, "[t]he threshold sufficiency that a complaint must meet to survive a motion to dismiss is exceedingly low." *Ancata v. Prison Health Serv., Inc.*, 769 F.2d 700, 703 (11th Cir.1985). When no construction of the factual allegations of the complaint will support the cause of action, however, dismissal of the complaint is appropriate. *See, Scelta v. Delicatessen Support Servs., Inc.*, 57 F.Supp.2d 1327, 1335 (M.D.Fla. 1999).

## III. Background

In 1992, Congress created the Urban Revitalization Demonstration Program,

**2.** All Defendants in this action raised threshold jurisdictional issues concerning the Court's subject matter jurisdiction. Defendants challenged Plaintiffs' standing to bring this action, and the ripeness of several of Plaintiffs' claims. In its May 24, 2002 order, the Court held that Mary Reese and Velma Bailey, as current tenants, had Article III standing to bring this action and that their claims were ripe for review. The Court, however, held that Shanlavie Jenkins, as a waiting list tenant, and L.I.F.F.T., an unincorporated association, did not possess Article III standing to pursue this cause. The Court specifically held that the claimed injury of the waiting list tenants, including Ms. Jenkins, was not sufficiently concrete to confer Article III standing upon them. With regard to L.I.F.F.T., the Court held that it did not pos-sess Article III standing in its own right or on behalf of its members. Accordingly, Mary Reese, Velma Bailey, and a potential class of current public housing tenants are the only remaining Plaintiffs to this case.

**3.** Also filed with the Court is Plaintiffs' motion for class certification. In a contemporaneously issued order, the Court granted Plaintiffs' motion to certify the class. The Court certified a class composed of all African–American individuals residing in Scott Homes Public Housing Project as of September 17, 1999. In addition, Plaintiffs filed a motion for a preliminary injunction. In an order dated April 24, 2002, the undersigned referred that motion to United States Magistrate Judge William C. Turnoff for appropriate resolution.

otherwise known as HOPE VI. HOPE VI provides funding to certain counties for "major reconstruction of severely distressed or obsolete public housing projects." (Compl.¶ 27.) The goal of this legislation is to improve the living conditions of public housing residents through, among other things, the demolition of obsolete public housing projects. (*Id.* at ¶ 28.) A county wishing to receive a HOPE VI grant must first file, with HUD, an application describing the community to be developed. Once HUD approves the application, the county agency (e.g., the Miami–Dade Housing Agency) and HUD enter into a "Grant Agreement." (*Id.* at ¶ 30.) Among other things, the agreement requires that HUD approve a specific "revitalization plan" prior to releasing the funds. (*Id.*)

Scott/Carver Homes (collectively "Scott Homes") is a public housing project located in Miami–Dade County.[4] Scott Homes, constructed in 1953, contains 850 units of public housing composed of: 8 one-bedroom units, 312 two-bedroom units, 400 three-bedroom units, 75 four-bedroom units, 53 five-bedroom units, and 2 six-bedroom units. (*Id.* at ¶ 45.) Scott Homes' tenants are very poor, 99% of whom are African–American; moreover, families with children account for a majority of the residents of Scott Homes. (*Id.* at ¶¶ 46, 47, and 91.)

In 1996, the County Defendants applied for a HOPE VI grant to revitalize Scott Homes. The proposed agreement provided for the demolition of 149 of the 850 existing units. The proposal, moreover, would have resulted in a community with over 500 units of rehabilitated public housing, 100 market rate rental units, and extensive home ownership programs. The proposal also stated that none of the current Scott Homes tenants would be relocated. The Federal Defendants, however, did not approve the proposal and, therefore, HUD did not award the County Defendants a HOPE VI grant at that time. (*Id.* at ¶ 60.) Similarly, the County Defendants' proposals for the years 1997 and 1998 were not approved. (*See id.* at ¶ 61.)

In May 1999, the County Defendants submitted their current HOPE VI application. The application calls for the demolition of the 850 units described above and proposes to replace those units with: 80 units of "conventional rental" public housing [5]; 135 units of "rent to own" public housing [6]; and 247 units of "other home ownership housing." (*Id.* at ¶ 63.) In September 1999, the Federal Defendants accepted the County Defendants' application, and awarded them a $35 million HOPE VI grant to "revitalize" the Scott Homes community.

In May 2001, the Miami–Dade Housing Agency authorized construction of 175 units of "Section 8" housing in the area surrounding Scott Homes.[7] This addition-

---

4. The Miami–Dade Housing Agency is the principal provider of public housing in Miami–Dade County administering approximately 11,000 units of conventional public housing. *See,* Compl. ¶ 49.

5. The "conventional rental" public housing will consist of: 2 one-bedroom units; 25 two-bedroom units; 43 three-bedroom units; 8 four-bedroom units; 2 five-bedroom units; and 0 six-bedroom units. (*See,* Compl. at ¶ 64.)

6. The "rent to own" public housing will consist of 1 one-bedroom unit; 53 two-bedroom units; 68 three-bedroom units; 12 four-bedroom units; 1 five-bedroom unit; and 0 six-bedroom units. (*See id.*)

7. The federal "Section 8 Voucher Program" is a portable tenant-based subsidy that families use to rent housing on the private rental market. This program is administered through various state housing agencies such as the Miami–Dade Housing Agency. (*See id.* at ¶ 53.)

al housing was not part of the HOPE VI plan approved by the Federal Defendants. The County Defendants ultimately decided that occupancy of this additional housing would be limited to elderly and disabled persons.[8]

Plaintiffs commenced this purported class-action lawsuit complaining that the Defendants' proposals surrounding the HOPE VI grant are illegal. Plaintiffs allege that the Defendants' configuration of the HOPE VI project was consciously designed for purposes of discouraging African–Americans from living in the Scott Homes neighborhood. (*Id.* at ¶ 2.) Plaintiffs claim that implementation of the project, as currently configured, will exacerbate Miami–Dade County's existing "affordable housing crisis" and result:

> (1) in the destruction of desperately needed affordable housing for very poor families in the Scott Homes community, who are overwhelmingly African–American; (2) in the forced displacement of the predominantly African–American residents of the Scott Homes community; (3) in a dramatic reduction in the amount of [ ] affordable housing available for the displaced African–American residents of Scott Homes; (4) a significant reduction in the amount of housing affordable to poor residents of Miami–Dade County, who are predominantly African–American[;] and (5) a dramatic reduction in the amount of housing affordable and available to large families

who will be among those most severely affected by the project. (*Id.*)

Plaintiffs contend that "[t]hese families will not only be effectively excluded from the new Scott Homes community but will also find little or no alternative housing in the larger Miami–Dade area." (*Id.*) Accordingly, Plaintiffs seek to halt all relocation or demolition activities related to Scott Homes.[9] The County Defendants filed the instant motion seeking to dismiss counts X, XI, XII, and XIV of Plaintiffs' complaint. Plaintiffs filed a response, and the motion is ripe for adjudication.

## IV. Analysis

### Count X

Count X of Plaintiffs' complaint is brought under the Quality Housing and Work Responsibility Act of 1998 ("QHWRA"), 42 U.S.C. § 1437. Plaintiffs attempt to enforce their QHWRA claim through 42 U.S.C. § 1983. Plaintiffs allege that the County Defendants violated QHWRA because their revitalization plan does not "affirmatively further fair housing." The County Defendants move to dismiss this claim arguing that section 1983 cannot serve as an enforcement mechanism to bring a QHWRA claim because QHWRA does not establish an enforceable private cause of action. The County Defendants assert that QHWRA merely sets forth a policy declaration regarding disbursements of grants.[10]

---

**8.** According to Plaintiffs' complaint, at the time of filing, the County Defendants have undertaken no steps to begin construction of the 175 Section 8 units.

**9.** At the request of the parties, the Court ordered that the County Defendants cease and desist from demolishing any of the Scott Homes' buildings pending a Court order on Plaintiffs' motion for a preliminary injunction. *See,* Order Granting Enlargement of Time dated October 17, 2001 (DE 24).

**10.** The Court notes that the County Defendants have not adequately briefed this issue. The County Defendants' argument that QHWRA does not establish an enforceable private cause of action is stated in conclusory fashion and is unsupported by cases or any other citation. Indeed, in their brief filed in reply to Plaintiffs' opposition papers, the County Defendants do not attempt to refute Plaintiffs' arguments in opposition.

Section 1983 imposes liability on anyone who, under color of state law, deprives a person "of any rights, privileges, or immunities secured by the Constitution and laws." "This provision safeguards certain rights conferred by federal statutes." *Blessing v. Freestone*, 520 U.S. 329, 340, 117 S.Ct. 1353, 137 L.Ed.2d .569 (1997) (citation omitted). "In order to seek redress through § 1983, however, a plaintiff must assert the violation of a federal right, not merely a violation of federal law." *Id.* (citation omitted). Courts look at three factors to determine whether a particular statutory provision gives rise to a federal right. *See id.*

First, Congress must have intended that the provision in question benefit the plaintiff. Second, the plaintiff must demonstrate that the right assertedly protected by the statute is not so "vague and amorphous" that its enforcement would strain judicial competence. Third, the statute must unambiguously impose a binding obligation on the States. In other words, the provision giving rise to the asserted right must be couched in mandatory, rather than precatory, terms. *Id.* at 340–41, 117 S.Ct. 1353 (citations omitted).

Here, the County Defendants do not articulate which element[s] of this three-part test is lacking. As mentioned above, their argument was stated in conclusory fashion. Nevertheless, the Court will address each element in turn.

■ First, any provision requiring governmental agencies to "affirmatively further fair housing" is clearly intended to benefit, among others, individuals such as the Plaintiffs in this case. Second, Plaintiffs' right to have governmental agencies affirmatively further fair housing does not appear to be so "vague and amorphous" that its enforcement would strain judicial competence. Indeed, Plaintiffs have referred the Court to several cases constru-

ing identical or similar language which hold that such language imposes a duty upon HUD. *See, Anderson v. City of Alpharetta*, 737 F.2d 1530, 1537 (11th Cir. 1984) (holding that HUD's "affirmative" obligation under the Fair Housing Act may subject it to liability in certain circumstances); *see also, N.A.A.C.P. v. Sec'y of Hous. and Urban Dev.*, 817 F.2d 149, 155 (1st Cir.1987) (noting that every court that has considered the question has held or stated that the Fair Housing Act imposes a duty upon HUD to affirmatively further fair housing). Finally, as the previously cited cases suggest, the Court finds that the duty to "affirmatively" further fair housing imposes a binding obligation upon the States. Accordingly, the County Defendants' motion to dismiss count X should be denied.

*Counts XI and XII*

Counts XI and XII of Plaintiffs' complaint revolve around the County Defendants' use of a $2 million Community Development Block Grant ("CDBG") in conjunction with the HOPE VI project. These claims were brought pursuant to the Housing and Community Development Act ("HCDA"), 42 U.S.C. § 5304(d)(2)(A)(i). Plaintiffs' complaint states that, by using CDBG money to implement its HOPE VI plan, the County Defendants are violating HCDA because their overall plan does not (1) provide comparable replacement dwellings for the same number of occupants (count XI) and (2) have an anti-displacement relocation plan (count XII). The County Defendants argue that the mere use of "ancillary" CDBG funds, in conjunction with the HOPE VI project, does not subject the HOPE VI project to the requirements of HCDA.

■ 42 U.S.C. § 5304(d)(1) states that a CDBG may be made "only if the grantee

certifies that it is following a residential antidisplacement and relocation assistance plan." In accordance with said plan, section 5304(d)(2)(A)(i) requires governmental agencies receiving a CDBG to "provide within the same community comparable replacement dwellings for the same number of occupants as could have been housed in the occupied and vacant occupiable low and moderate income dwelling units demolished." The Court finds that the plain language of this statute does not free the County Defendants from the requirements of section 5304(d) merely because some CDBG funds will be used in connection with the much larger HOPE VI project.[11] The County Defendants have not directed the Court to any authority suggesting that a distinction exists between projects funded in whole or in part by CDBG funds. Accordingly, the County Defendants' motion to dismiss counts XI and XII should be denied.

*Count XIV*

Count XIV of Plaintiffs' complaint, asserted against all Defendants, is brought pursuant to the Uniform Relocation Assistance and Real Property Acquisition Act of 1970 ("URA"). Apparently, Plaintiffs attempt to enforce this claim through 42 U.S.C. § 1983. The County Defendants move to dismiss this count arguing that the Court does not have subject matter jurisdiction over this claim. The Court agrees.

■ In *Ackerley Communications of Fla. v. Henderson,* 881 F.2d 990, 993, (11th Cir.1989), the Court held that "Congress

intended that the Administrative Procedure Act would be the exclusive remedy for alleged violations of the URA." The Eleventh Circuit noted that "Congress could have expressly provided that claims against federal agencies which fail to comply with the URA would be brought under Sec.1983, but instead chose the [Administrative Procedure Act] as the enforcement mechanism." *Id.* Review of purported violations of the URA, therefore, should be conducted in accordance with the Administrative Procedure Act. Accordingly, count XIV should be dismissed.

## V. Conclusion

For the reasons stated above, it is ORDERED AND ADJUDGED that the remainder of the County Defendants' motion to dismiss is DENIED IN PART AND GRANTED IN PART. Counts X, XI, and XII remain. The County Defendants shall have twenty (20) days from the date of this order in which to answer Plaintiffs' complaint. Count XIV is hereby DISMISSED for lack of subject matter jurisdiction. It is further ORDERED AND ADJUDGED that to the extent the County Defendants move for a more definite statement, such motion is DENIED.

---

11. The parties have referred the Court to a HUD "policy memo" which states that in circumstances where non-CDBG funds are used to demolish housing, the statutory requirements for replacement housing and/or relocation assistance will be triggered if the demolition is integrally linked to a CDBG-assisted activity. Here, the Court notes that whether the demolition of Scott Homes, pursuant to the $35 million HOPE VI project, is "integrally" linked to the County Defendants' use of the $2 million CDBG is not readily apparent. Discussion of this particular issue, including the deference afforded such a document, is more appropriately addressed in a properly supported summary judgment motion.